BLANK ROME LLP
*Attorneys for Plaintiff*
William R. Bennett, III
Lauren B. Wilgus
Rick Antonoff
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000
William.Bennett@blankrome.com
Lauren.Wilgus@blankrome.com
Rick.Antonoff@blankrome.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
PREBLE – RISH HAITI, S.A.                                      :
:
Plaintiff,                                :
:   Civil Action:
- against -                                :   IN ADMIRALTY
:
REPUBLIC OF HAITI, BUREAU DE MONÉTISATION                      :
DES PROGRAMMES D'AIDE AU DÉVELOPPEMENT,                        :
:
Defendants.                               :
---------------------------------------------------------------x

## VERIFIED COMPLAINT

Plaintiff, Preble-Rish Haiti, S.A. ("PRH"), by and through its attorneys Blank Rome LLP, as and for its Verified Complaint against the Defendants Republic of Haiti and Bureau De Monétisation Des Programmes D'aide Au Développement (collectively "BMPAD"), *in personam*, alleges as follows:

## JURISDICTION AND VENUE

1. This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The claims against BMPAD arise out of BMPAD's breach of a maritime

contract of affreightment with PRH for the supply and ocean carriage of high sulfur fuel oil ("HSFO") to Haiti (the "Contract"). The Court has admiralty jurisdiction under 28 U.S.C. §1333.

2.  Venue is proper in this District because there is, or will be during the pendency of this action, property of or due and owing to BMPAD within or moving through this District as will be more fully discussed herein.

3.  BMPAD is not registered to do business in New York. As such, BMPAD cannot be found in this District within the meaning of Rule B of the Supplemental Rules for Admiralty and Maritime Claims.

## THE PARTIES

4.  PRH is a company organized under the laws of Haiti with a principal place of business located at Hexagon Building, 5th Fl, Angle Rues Clerveaux and Darguin, Pétion Ville, Haiti.

5.  Defendants are foreign entities organized under the laws of Haiti, with a principal place of business located at No.12 Boulevard Harry Truman, Port-au-Prince, Haiti.

## THE FACTS[1]

**A.  The Contract**

6.  In July 2019, BMPAD was seeking suppliers for the purchase of HSFO. (Leconte Dec. at ¶ 1.)

7.  On July 15, 2019, PRH presented its credentials, including its recent successful history in sourcing and selling petroleum-based products to BMPAD. (Leconte Dec. at ¶ 2; Exhibit A.)

---

[1] A true and correct copy of the Declaration of Josue Leconte dated February 7, 2022 is attached as Ex. 1. (the "Leconte Decl.")

8. Most importantly, PRH offered to provide BMPAD with credit terms for all or a portion of the purchase price. Considering the difficulty that BMPAD experienced in obtaining credit in the international markets, PRH believes that its offer of credit was a significant consideration in BMPAD's decision to award the HSFO contract to PRH. (Leconte Dec. at ¶ 3.)

9. On October 9, 2019, BMPAD and PRH signed the Contract—prepared by BMPAD in English—whereby PRH agreed to deliver and BMPAD agreed to purchase six deliveries of approximately 35,000 barrels of HSFO every two months. (Leconte Dec. at ¶ 4; Exhibit B.)

10. The Contract is governed by the laws of the State of New York and provides for arbitration of disputes in New York City. Specifically, the Contract provides:

> **GOVERNING LAW**
>
> The contract will be governed by and construed in accordance with New York law, without reference to its law on conflicts. The United Nations convention on contracts for the international sale of goods will not in any way govern or apply to this contract.
>
> **ARBITRATION**
>
> Should any dispute arise between parties buyers and sellers in connection with this contract, the matter in dispute shall be submitted by either party hereto to arbitration in New York City, before three arbitrators. The party initiating arbitration shall provide written notice of its intent to submit the matter for arbitration. Such notice shall contain a statement identifying the claim for arbitration and specifying the initiating party's designated arbitrator. Within ten (10) days following such notice of arbitration, the other party shall appoint its designated arbitrator. If such party fails to appoint an arbitrator within the applicable 10-day period and give timely notice of such appointment to the initiating party, then the initiating party shall be entitled to specify such second arbitrator as well. The third arbitrator shall be selected by the two arbitrators so chosen. Each party will bear and pay the costs of the arbitrator appointed by (or for) it and the cost of the third arbitrator shall be limited and paid equally by the parties. The decision of the arbitrators shall be final, conclusive and binding on all parties. Judgment may be entered upon any such award in any court with jurisdiction. ·For disputes of less than USD 25,000 one arbitrator will be used as agreed by both parties. If both parties fail to agree on one arbitrator, the Seller will appoint a suitable arbitrator. No arbitrator shall be an

>employee, representative or agent of any party and each shall be reasonably believed by the selecting party to possess the requisite experience, education and expertise in respect of the matters to which the claim relates to enable such person to competently perform such arbitral duties.

(Leconte Dec. at ¶ 5; Exhibit B.)

11. PRH agreed to provide credit terms for 100% of the purchase price and the Contract gives BMPAD the right for each monthly delivery to select from two pricing options, one for 30-day credit terms and one for 60-day credit terms. (Leconte Dec. at ¶ 6.)

12. The Contract also provided that BMPAD, prior to the first shipment, was required to provide PRH with a standby letter of credit from Bank of the Republic of Haiti ("BRH") for US$7,000,000 (the "Standby Letter of Credit") and that PRH was not required to procure or deliver HSFO to BMPAD unless there was sufficient availability under the Standby Letter of Credit to cover full payment of the purchase price. (Leconte Dec. at ¶¶ 7 & 8.)

13. On October 10, 2019, BMPAD notified the Minister of Economy and Finance that BMPAD selected PRH as its supplier of HSFO and requested the Minister of Economy and Finance to direct BRH to issue the required Standby Letter of Credit. (Leconte Dec. at ¶ 9; Exhibit C.)

14. The Standby Letter of Credit was not issued by BRH until five months later. (Leconte Dec. at ¶ 10.)

15. The Contract was based on CIF incoterms. At that time, HSFO was then only available for purchase in the United States on an FOB basis because U.S. suppliers expressed an unwillingness to provide transport to Haiti. As a result, PRH was required to facilitate a tanker charter for one year to cover the Contract period. (the "Charter"). Under the Charter, PRH was responsible for the daily charter payments as well as insurance, bunkering, towage, pilotage, agency fees, port charges, expenses of loading and unloading cargo and other operational

4

expenses. PRH was also responsible for providing the Master with instructions, including loading and unloading of cargo and sailing directions. In addition, the Master was required to execute bills of lading. (Leconte Dec. at ¶ 11.)

16.     Notwithstanding repeated requests to do so by PRH, by the beginning of March 2020, BMPAD had still not provided the required Standby Letter of Credit. Because PRH chartered a vessel and sourced the first shipment of HSFO, by letter dated March 2, 2020, PRH proposed to BMPAD that it would be willing to deliver the first shipment against a cash prepayment by BMPAD. (Leconte Dec. at ¶ 12 & 13; Exhibit D.)

17.     BMPAD agreed and the parties memorialized their agreement in Amendment No. 1 to the Contract in early March 2020. (Leconte Dec. at ¶ 14; Exhibit E.)

18.     Amendment No 1—also written in English—required BMPAD to make a prepayment of US $2,068,850 for the first shipment, pay a demurrage and laytime rate of $25,000 per day and made it clear that BMPAD was responsible for other charges incurred while the vessel was in Haiti. (Leconte Dec. at ¶ 15.)

19.     BMPAD wished to make some changes to the technical specifications contained in the October 2019 contract and furnished PRH with revised specifications which were attached to Amendment No. 1. (Leconte Dec. at ¶ 16.)

20.     The Contract provided that BMPAD "reviewed the attached Product specifications and has found them satisfactory and suitable for the use …[BMPAD] intends" and required PRH to obtain an independent inspector's report of quantity and quality at the point of origin. The Contract further provides that the independent inspector's findings "shall be binding on both the Buyer and Seller…." And, the Contract makes it clear that PRH "has not made an independent examination of the Product's suitability for use and shall have no liability whatsoever in the event

the Product specifications are not suitable for …[BMPAD's] intended use." (Leconte Dec. at ¶ 17.)

21. Although BMPAD agreed in Amendment No. 1 that it would make a prepayment for the first HSFO shipment, it never did so. (Leconte Dec. at ¶ 18.)

**B. The First Shipment**

22. On April 7, 2020, PRH notified BMPAD that 33,000 barrels of HSFO were scheduled to arrive on or about April 11, 2020. (Leconte Dec. at ¶ 19; Exhibit F.)

23. On April 15, 2020, PRH provided BMPAD with the shipping documents, including the independent inspector's report, for the first HSFO delivery. (Leconte Dec. at ¶ 20; Exhibit G.)

24. On April 16, 2020, PRH wrote to BMPAD regarding the arrival of PRH's vessel and provided BMPAD with an invoice for US$2,019,600 based on the Contract's price applicable to 60-day credit terms. (Leconte Dec. at ¶ 21; Exhibit H.)

25. On April 20, 2020, after the delivered cargo was surveyed, PRH sent BMPAD a revised invoice of $1,978,147.40 based on actual quantities delivered. (Leconte Dec. at ¶ 22; Exhibit I.)

26. On April 23, 2020, PRH sent BMPAD an invoice for reimbursement of wharfage expenses in the amount of US$27,401.04. (Leconte Dec. at ¶ 23; Exhibit J.)

27. On further review of the Contract, PRH realized that BMPAD had not selected 30 or 60-day credit terms for the first HSFO shipment and re-calculated the invoice based on the lower prices applicable to 30-day credit terms. On May 15, 2020, PRH sent BMPAD a revised invoice for $1,910,593.02 for the first shipment. (Leconte Dec. at ¶ 24; Exhibit K.)

28. On April 21, 2020, albeit six month's past due, BRH issued the Standby Letter of Credit in favor of PRH in the amount of US$7,000,000. (Leconte Dec. at ¶ 25; Exhibit L.)

29. Under the Contract, BMPAD was required to pay the invoice for the first shipment on May 15, 2020, 30-days after the date of the invoice. BMPAD failed to make payment on the due date, which was an Event of Default under the Contract. Therefore, on May 19, 2020, PRH drew down on the Standby Letter of Credit the sum of $1,937,974.06 which was the sum of the unpaid HSFO invoices and the unpaid wharfage charges. (Leconte Dec. at ¶ 26.)

C. **The Second Shipment**

30. On June 8, 2020, PRH notified BMPAD that the second shipment of HSFO was due to be delivered and provided an invoice for US$1,947,400, calculated based on the 30-day credit terms provided in the Contract. (Leconte Dec. at ¶ 27; Exhibit M.)

31. On July 14, 2020, BMPAD paid PRH by wire transfer the sum of US$2,019,600, the amount of PRH's original April invoice for the first shipment, even though, as described above, PRH had previously sent BMPAD two revised invoices lowering the amount due and had already received payment for the first shipment through its May drawing on the Standby Letter of Credit. (Leconte Dec. at ¶ 28.)

32. On July 16, 2020, PRH wrote to BMPAD acknowledging BMPAD's July 14th payment but pointed out that it had already received payment for the first shipment under the Standby Letter of Credit two months earlier. PRH also advised BMPAD that it would apply the amount of BMPAD's July payment to PRH's June 8, 2020 invoice for the second shipment, leaving BMPAD with a credit of US $72,200.00. (Leconte Dec. at ¶ 29; Exhibit N.)

33. On July 24, 2020, PRH notified BMPAD of the ETA for second shipment of HSFO and provided BMPAD with the shipping documents, including the independent inspector's report. (Leconte Dec. at ¶ 30; Exhibit O.)

34. The second shipment arrived in Haiti on July 27, 2020. (Leconte Dec. at ¶ 30.)

35. On July 28, 2020, one day after the arrival of the second shipment, BMPAD notified PRH that it would not permit PRH's vessel to unload and would not accept the second HSFO shipment because "it no longer needed HSFO." BMPAD claimed its customer had decided to change its fuel requirements from HSFO to diesel. (Leconte Dec. at ¶ 31; Exhibit P.)

36. On July 29, 2020, PRH reminded BMPAD that PRH notified BMPAD of the second shipment in early June and demanded BMPAD accept delivery of the second shipment. PRH also reminded BMPAD of its obligation to pay demurrage and other costs. PRH also pointed out BMPAD's payment obligations under the Event of Default provision contained in the Contract. (Leconte Dec. at ¶ 33; Exhibit Q.)

37. BMPAD attempted to excuse its non-performance by claiming the HSFO did not meet the technical specifications of the Contract, even though BMPAD had already received reports from independent inspectors showing compliance with the Contract. PRH then commissioned a second inspection at the arrival port by an independent inspector, which also certified compliance with the Contract specifications. On August 3, 2020, PRH provided BMPAD with the independent inspector's analysis of the HSFO and again insisted BMPAD take delivery of the HSFO as the Contract requires. (Leconte Dec. at ¶ 34; Exhibit R.)

38. On August 8, 2020, BMPAD agreed to accept as much HSFO as its terminal tanks could hold. Thereafter, approximately 30,000 barrels of HSFO were discharged into BMPAD's tanks leaving approximately 5,000 barrels remaining on the vessel. (Leconte Dec. at ¶ 35.)

39. On August 14, 2020, PRH notified BMPAD that it needed to accept delivery of the remaining 5,000 barrels of HSFO and provided BMPAD with an invoice for $425,000 for 17 days of demurrage at the Contract rate of $25,000 per day. (Leconte Dec. at ¶ 36.)

40. On August 25, 2020, PRH wrote to BMPAD reminding them of their obligation to

accept delivery of the remaining HSFO and provided BMPAD with a revised invoice for demurrage totaling $700,000. BMPAD was also reminded that independent inspection of the HSFO showed that it matched the Contract specifications. (Leconte Dec. at ¶ 37; Exhibit S.)

41. Although the Event of Default section of the Contract provides guidance on payment procedures for the calculation of damages on breach, BMPAD made no effort to comply with those payment terms and made no proposal for restructuring or terminating the Contract. Accordingly, PRH continued to comply with its contractual obligations and notified BMPAD on August 28, 2020 that the third shipment of HSFO was projected to arrive in Haiti on September 2020. (Leconte Dec. at ¶ 38; Exhibit T.)

42. On August 31, 2020, BMPAD again breached the Contract by notifying PRH that it would not accept further shipments because its resale customer had switched its fuel requirements from HSFO to diesel. BMPAD further stated that it had instructed Haitian governmental authorities to deny PRH's vessel carrying HSFO access to Haitian ports. (Leconte Dec. at ¶ 39; Exhibit U.)

43. Thereafter, PRH ceased its efforts to procure additional supplies. (Leconte Dec. at ¶ 39.)

44. On August 31, 2020, PRH reminded BMPAD of its obligation to accept the remaining 5,000 barrels from the second shipment, which remained on board PRH's vessel, and notified BMPAD that if BMPAD did not accept delivery of the 5,000 barrels, PRH would attempt to resell the barrels and, after deduction of sales expenses, credit BMPAD with the sales proceeds. In addition, PRH advised BMPAD that if a buyer could not be found, PRH would store the 5,000 barrels remaining from the second shipment of HSFO at BMPAD's expense although it could not guarantee BMPAD that quality could be maintained during storage. (Leconte Dec. at ¶ 41; Exhibit

V.)

45. On September 1, 2020, BMPAD again confirmed that its re-sale customer no longer wanted HSFO so BMPAD would no longer accept or pay for shipments. (Leconte Dec. at ¶ 42.)

46. On the same day, PRH notified BMPAD that they had committed an Event of Default under the Contract by failing to pay PRH's outstanding invoices and refusing, without justification, to accept the future deliveries it had contracted to accept and pay for. (Leconte Dec. at ¶ 43.)

47. PRH invoiced BMPAD in the amount of US $8,275,400 for the remaining four shipments under the Contract and warned BMPAD that if they were not paid PRH would draw down under the Standby Letter of Credit. (Leconte Dec. at ¶ 44; Exhibit W.)

48. On September 2, 2020, senior representatives of BMPAD and PRH met at the Prime Minister's office to see if a resolution could be found. BMPAD's position remained that they would not accept further shipments because they no longer needed HSFO to supply its customer. However, PRH and BMPAD agreed that PRH would discharge and store the remaining 5,000 barrels of the second shipment at BMPAD's expense, as provided in PRH's letter of August 31, 2020. (Leconte Dec. at ¶ 45.)

49. On September 10, 2020, PRH notified BMPAD that it had obtained storage for the remaining second shipment of HSFO and that demurrage had therefore come to an end. PRH invoiced BMPAD for $975,000 representing 39 days of demurrage at the Contract rate with a due date of September 14, 2020. BMPAD failed to pay the demurrage invoice. (Leconte Dec. at ¶ 46; Exhibit X.)

50. On September 18, 2020, PRH drew down under the Standby Letter of Credit for the remaining available amount of $5,062,005.94 after providing BRH with the unpaid invoices

for the remaining four shipments. (Leconte Dec. at ¶ 47; Exhibit Y.)

51. On October 5, 2020, PRH notified BMPAD that it had received $5,062,005.94 from BRH under the Standby Letter of Credit. PRH also referred BMPAD to the Event of Default section in the Contract which makes BMPAD responsible for the substantial expenses PRH incurred in entering into long term contracts with ship owners and others in reliance that BMPAD would perform its obligations under the Contract. PRH told BMPAD that it was contractually obligated to continue deliveries under the Contract unless appropriate amendments were entered into to reschedule deliveries or to compensate PRH for its losses due to the breach. (Leconte Dec. at ¶ 48; Exhibit Z.)

52. PRH continues to hold the proceeds of the drawing under the Standby Letter of Credit as cash collateral for all the obligations of BMPAD under all contracts between BMPAD and PRH, as the Contract permits. BMPAD has made no effort to restructure the Contract or compensate PRH for its losses, notwithstanding the very clear standards for calculating damages contained in the Contract. (Leconte Dec. at ¶ 49.)

53. BMPAD has continued to insist that it is not obligated to perform its obligations under the Contract if it is inconvenient for them to do so, thereby maintaining its long history of payment defaults and complete disregard for its contractual obligations. (Leconte Dec. at ¶ 49.)

54. By letter dated July 1, 2021, PRH informed BMPAD of its intention to commence arbitration and seek recovery of the amount then owing to PRH, which then amounted to US $9,250,400. PRH again advised BMPAD that it was holding cash collateral in the amount of $5,062,005.94, which represented the proceeds of the Standby Letter of Credit and advised that it was reserving its right to apply this amount to any obligation owed to PRH by BMPAD, whether or not under the Contract. (Leconte Dec. at ¶ 50; Exhibit AA.) BMPAD did not respond.

55. On October 8, 2021, PRH sent BMPAD a Notice Demanding Arbitration. In the Notice, PRH informed BMPAD that it had nominated Mr. Robert Shaw as its party appointed arbitrator. PRH also and advised BMPAD that it had ten days in which to nominate an arbitrator and if they did not nominate an arbitrator PRH would nominate a second arbitrator. (Leconte Dec. at ¶51; Exhibit BB.)

56. BMPAD did not nominate an arbitrator. Thus, on October 20, 2021, PRH nominated LeRoy Lambert as the second arbitrator. (Leconte Dec. at ¶ 52; Exhibit CC.)

57. Thereafter, the Messrs. Shaw and Lambert nominated Mr. Louis Epstein to be Chairman of the arbitration Panel.

### D. DAMAGES

58. The damages suffered by PRH can be calculated as follows:

|      |                                                      |                  |
|------|------------------------------------------------------|------------------|
| i.   | Invoice 1st Shipment                                 | $1,910,593.02    |
| ii.  | Wharfage (Exh. J)                                    | $27,401.04       |
| iii. | Draw down on SLOC                                    | <$1,937,974.04>  |
| iv.  | Invoice 2nd Shipment                                 | $1,947,400.00    |
| v.   | BMPAD wire                                           | <$2,019,600.00>  |
| vi.  | Demurrage (Exh. X & N.)                              | $975,000.00      |
| vii. | Charter M/V Iver (9.10.20 to 1/10/21)                | $1,300,000.00    |
| viii.| Bunkering, port charges, etc.                        | $450,000.00      |
| ix.  | Cargo storage & disposal costs post default          | $800,000.00[2]   |
| x.   | Lost profit (Shipments 3 through 6)                  | $4,100,000.00    |
| xi.  | Interest on unpaid amounts through January 31, 2022. | $325,000.00      |
| xii. | Est. legal and arbitration fees                      | $1,200,000       |
|      | **Total**                                            | $9,077,800.00[3] |

---

[2] This was the resolution reached on September 10, 2020 that PRH would store the 5,000 barrels of mazut that BMPAD refused to take off the Iver Best at BMPAD's expense. Notwithstanding several notices to BMPAD to take possession of the stored cargo, BMPAD has not done so.

[3] PRH drew down on the letter of credit and is holding $5,062,005.94 as security for ALL claims PRH as against BMPAD as permitted under New York's law regarding set-off and as permitted by the Contract.

12

59. PRH's total damage resulting from BMPAD's breach of the contracts is currently **$9,077,800.00**, and damages continue to accrue.

60. PRH is entitled to costs and attorney's fees as well.

### The Rule B Action

61. PRH commenced this action to obtain security for the claims described above and reserves its right to arbitrate all such disputes as well as such additional ones as may arise. In particular, PRH reserves its right to amend this Complaint and to claim in the New York arbitration amounts based on claims alleged above but not yet fully quantified and to include such additional claims and damages as it may suffer as a result of BMPAD's breach of the maritime contract.

62. The principal amount of the claims for which PRH presently seeks security in this action is **$9,077,800.00.**

63. The claim with respect to the alleged breach of the maritime contract has been expensive to prepare and present to the New York arbitrators. Maritime Arbitrators in New York routinely award interest, legal fees and arbitral costs to a successful party. PRH estimates interest and legal costs will be in the sum of at least **$1,000,000**.

64. The total amount of PRH's claims for which PRH requests issuance of Process of Maritime Attachment and Garnishment is **$10,077,800.00**.

65. BMPAD cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but BMPAD is believed to have or will have during the pendency of this action, assets

---

PRH and BMPAD are also parties to a 2018 contract for the sale of asphalt which BMPAD has also breached and where damages substantially exceed the cash collateral held by PRH.

within this district consisting of cash, funds, freight, hire, and/or credits in the hands of garnishees in this District.

66. PRH believes BMPAD has assets in the possession of several banks in the District, including but not limited to, Citibank N.A., BNC Bank, Bank of NY Mellon, Natixis Bank, and based on financial information available to PRH.

## AS AND FOR A FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT)

67. PRH repeats and realleges each and every allegation set forth above as if set forth at length herein.

68. As set forth above in detail, BMPAD breached the maritime contract of affreightment it entered with PRH.

69. Further, PRH incurred significant costs, including but not limited to daily charter payments to charter the vessel, as well as insurance, bunkering, towage, pilotage, agency fees, port charges, expenses of loading and unloading cargo and other operational expenses, wharfage, and cargo storage costs, for which BMPAD is responsible for.

70. As a direct and proximate result of BMPAD's breach of the maritime contract for the delivery of HSFO to Haiti, PRH was damaged in a sum of not less than **$10,077,800.00.**

## AS AND FOR A SECOND CAUSE OF ACTION
## (UNJUST ENRICHMENT)

71. PRH repeats and reasserts each and every allegation contained in the foregoing paragraphs as if set forth herein in full.

72. Alternatively, PRH is entitled to recover against BMPAD based on the doctrine of unjust enrichment because it directly benefitted, as set forth in detail above, from the receipt of HSFO from PRH, which it did not pay for and it would be inequitable and unconscionable to allow BMPAD to retain those benefits to the detriment of PRH.

73. Further, PRH incurred significant costs, including but not limited to daily charter payments to charter the vessel, as well as insurance, bunkering, towage, pilotage, agency fees, port charges, expenses of loading and unloading cargo and other operational expenses, wharfage, and cargo storage costs, for which BMPAD is responsible for.

74. BMPAD was unjustly enriched as a direct result of receiving the HSFO and not paying, as required, to the detriment of PRH.

75. As a direct and proximate result of BMPAD's actions, PRH has suffered damages in a sum of not less than **$10,077,800.00.**

**WHEREFORE**, PRH prays:

A. That process in due form of law issue against BMPAD citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B. That since the BMPAD cannot be found within this District pursuant to Rule B of the Supplemental Rules for Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of BMPAD's tangible or intangible property or any other funds held by any garnishee in the district, including but not limited to Citibank N.A., BNC Bank, Bank of NY Mellon, Natixis Bank, which are due and owing or otherwise the property of to the BMPAD up to the amount of **$10,077,800.00** to secure PRH's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C. That this Court enter judgment for PRH's damages plus costs, or, in the alternative, retain jurisdiction over this matter through the entry of a judgment on an arbitration award.

D. That PRH may have such other, further and different relief as may be just and proper.

Dated: February 7, 2022

**BLANK ROME LLP**
*/s/ William R. Bennett, III*
William R. Bennett, III
Lauren B. Wilgus
Rick Antonoff
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000
(917) 332-3068
William.Bennett@blankrome.com
Lauren.Wilgus@blankrome.com
Rick.Antonoff@blankrome.com

*Counsel for Plaintiff Preble-Rish Haiti, S.A.*

## **ATTORNEY'S VERIFICATION**

1. I am a member of the bar of this Honorable Court and of the firm of Blank Rome LLP, attorneys for the Plaintiff.

2. I have read the foregoing Verified Complaint and I believe the contents thereof are true.

3. The reason this Verification is made by the undersigned and not by Plaintiff is that Plaintiff is a foreign corporation, and no officer or director is presently within this jurisdiction.

4. The sources of my information and belief are documents provided to me and statements made to me by representatives of the Plaintiff.

Pursuant to 28 U.S.C. § 1746(1), I solemnly declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2022

**BLANK ROME LLP**
*/s/ William R. Bennett, III*
William R. Bennett, III
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000
(917) 332-3068
William.Bennett@blankrome.com